**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JILL D. GASTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-1436 |
| | ) | Hon. Nora Barry Fischer |
| JOSEPH L. CAUGHERTY and BOROUGH | ) | |
| OF BLAIRSVILLE, PENNSYLVANIA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

This is an employment discrimination and civil rights action brought pursuant to Title VII and 42 U.S.C. § 1983 wherein Plaintiff Jill Gaston ("Gaston") contends that Defendants Joseph Caugherty ("Caugherty") and the Borough of Blairsville ("Blairsville" or the "Borough") unlawfully removed her from the position of Officer in Charge of the Blairsville Police Department (the "Department") and failed to hire her as the new Chief of Police on the basis of her sex. (Docket Nos. 50, 69-2). Gaston brings claims for sex discrimination, retaliation, violations of her equal protection and procedural due process rights, and violation of the Equal Pay Act, as well as claims for hostile work environment and slander *per se*, stemming, in large part, from false rumors about her having an extramarital affair, which allegedly were spread by Caugherty. (Docket Nos. 50, 69-2).

Presently before the Court is Plaintiff's Motion for Leave to File Third Amended Complaint *nunc pro tunc*. (Docket No. 69). This Motion followed the Court striking the Third Amended Complaint for failure to comply with FED. R. CIV. P. 15(a)(2). (*See* Docket Nos. 67-

1

69).   Defendants now oppose Plaintiff's request for leave to amend a third time, arguing primarily that such an amendment would be futile.   (Docket No. 73).   Each party submitted briefing, (Docket Nos. 69, 73, 75, 80, 81), and the Court held oral argument on the motion on August 28, 2015, (Docket No. 82), after which each party submitted supplemental briefing. (Docket Nos. 89, 90).   The Motion is now ripe for disposition.

After careful consideration of the parties' positions and having evaluated the proposed pleading in light of the appropriate standard, for the following reasons Plaintiff's Motion [69] is granted, in part and denied, in part.   Plaintiff's motion is granted with regard to all counts except Count VI, the procedural due process claim, which the Court finds to be futile.

## I.   PROCEDURAL HISTORY

Gaston first filed this lawsuit on August 5, 2013 in the Court of Common Pleas of Indiana County, alleging slander *per se* as the only cause of action and naming Caugherty as the only defendant.   (Docket No. 1-2).   On October 3, 2014 Gaston amended her Complaint, adding the Borough as a defendant and adding counts for violations of the Equal Pay Act, Title VII employment discrimination and retaliation, and violations of her equal protection rights.   (Docket No. 1-7).   Because that Amended Complaint included federal claims, Defendants removed the case to this Court. (Docket No. 1).   Upon removal, Defendants answered the Amended Complaint, (Docket No. 3), and the case proceeded into discovery, (Docket No. 9).   Discovery thus far has proved contentious with the filing of a number of motions to compel and motions for protective orders, (Docket Nos. 24, 44, 45), and the Court being asked to referee several other disputes. (*See* Docket Nos. 14, 36).   After requesting and being granted leave to amend, Gaston filed her Second Amended Complaint on June 8, 2015, which added a count for alleged violation of her procedural due process rights.   (Docket No. 50).   Shortly thereafter, each Defendant filed a

motion to dismiss all counts of the Second Amended Complaint pursuant to FED.R.CIV.P. 12(b)(6). (Docket Nos. 51, 59). With dispositive motions pending along with a number of discovery motions, the Court granted a motion to stay discovery pending a ruling on the dispositive motions. (Docket Nos. 61, 66).

In response to Defendants' 12(b)(6) motions, Gaston then filed her Third Amended Complaint on July 1, 2015 without leave. (Docket No. 67). Because Plaintiff did not ask for leave prior to filing, the Court struck the Third Amended Complaint from the docket for failure to comply with FED.R.CIV.P. 15(a)(2). (Docket No. 68). Gaston then filed the present Motion for Leave to File Third Amended Complaint *nunc pro tunc*. (Docket No. 69). A copy of the Proposed Third Amended Complaint ( "Third Amended Complaint" or "proposed Complaint") is attached to the Motion for Leave. (Docket No. 69-2). Defendants oppose granting Gaston leave to amend on a number of grounds, but primarily on the ground that the amendment would be futile, asserting that it does not cure the pleading defects in the Second Amended Complaint. (Docket No. 73).

## II. FACTUAL BACKGROUND[1]

Gaston works as a police officer for the Borough of Blairsville Police Department (the "Department"). (Docket No. 69-2 at ¶ 2). During the relevant time period, Defendant Caugherty was the Mayor of Blairsville and previously served as its Chief of Police from 1995 to 2003. (*Id*. at ¶ 5). The Department has seen a number of employment related controversies over the last several years. A former officer filed a lawsuit against the Borough, alleging that she and other female officers faced discrimination on the basis of their sex. (*Id*. at ¶ 11). The Chief of Police who succeeded Caugherty was fired in 2009, which also resulted in a lawsuit against the

---

[1] Because the central issue is whether the Proposed Third Amended Complaint is futile, the factual allegations are taken from that document and references to the "proposed Complaint" refer to same unless noted otherwise.

Borough. (*Id*. at ¶ 12). The next chief resigned after only six months in the position. (*Id*. at ¶ 12). In an effort to "stabilize" the Department, the Borough Council voted unanimously to appoint Gaston as Officer in Charge ("OIC"), giving her "supervisory responsibility over the other officers in the Department, in addition to managerial and administrative duties involved with running the Department on a day-to-day basis." (*Id*. at ¶¶ 13-14, 17). As compensation for "the extra duties of running the Department," the Council voted to pay Gaston an annual stipend of $6,000.00 in addition to her regular salary as a police officer. (*Id*. at ¶ 14). The Proposed Third Amended Complaint avers that as her appointment to OIC made her responsible for running the Department, Gaston understood that her appointment as OIC "gave her the opportunity to demonstrate her competency for permanent appointment to the position of chief." (*Id*. at ¶ 15). Gaston further alleges that her "promotion to OIC constituted a substantial change in rank . . . ," (*Id*. at ¶ 17), consistent with her understanding of the appointment and the fact that neither the position of OIC nor the stipend was encompassed within the Collective Bargaining Agreement ("CBA") applicable to police officers in the Department. (*Id*. at ¶ 16).

After Gaston's appointment to OIC, tensions arose between Gaston and Mayor Caugherty, with Caugherty involving himself in day-to-day operations of the Department and undermining Gaston's authority. (*Id*. at ¶¶ 19-22). There also was confusion among the officers as to the precise nature of Gaston's authority. (*See id*. at ¶ 22). Borough Solicitor Patrick Dougherty clarified to Gaston that "as the duly-appointed OIC, she was in charge of the day-to-day operations of the Department and that Mayor Caugherty's role was limited to oversight with respect to budgetary matters such as approving (for financial purposes) the number of officers on duty at any particular time and the amount of overtime incurred." (*Id*. at ¶ 23). Gaston prepared a memorandum reflecting her understanding of the Borough Solicitor's opinion and circulated it

to the entire Department and Caugherty. (*Id*. at ¶ 23).

Despite the memo and a follow up meeting with Solicitor Dougherty, which Gaston, the Mayor, the Borough Manager, and most of the Police Officers attended and at which the Solicitor repeated what he had explained to Gaston, Caugherty continued to involve himself in directing the day-to-day operations of the Department. (*Id*. at ¶¶ 24-25). When confronted by Gaston, Caugherty told her that the Borough Council was unhappy with her performance as OIC, that she was about to be fired, and that she should resign from the Department in order to preserve her reputation; Gaston declined. (*Id*. at ¶¶ 25, 26). About a month later, the Borough Council did not fire her and, in fact, voted to reappoint Gaston as OIC for 2012. (*Id*. at ¶ 27).

In March of 2012, Caugherty went into the office of Executive Director of the Municipal Authority (the "Authority"), Ronald Hood ("Hood"), and told Hood that Gaston, who is married, and a particular male Municipal Authority employee, also married, were engaged in an inappropriate sexual relationship taking place while on municipal property. (*Id*. at ¶¶ 29, 45). Caugherty then stopped by the home of Terry DeBiase, a member of the Blairsville Municipal Authority Board and a neighbor of Gaston, and repeated the same rumor. (*Id*. at ¶¶ 31, 36). The proposed Complaint alleges that Caugherty knew these statements were false or was at least reckless with regard to the truth. (*Id*. at ¶¶ 33, 42). Specifically, he knew that Gaston had a longstanding practice of bringing in food for Borough and Authority employees and that she was a long-time friend of the Authority employee in question, yet he spread rumors that she brought the food as a masquerade for the alleged affair. (*Id*. at ¶¶33-34; first ¶39).[2]

For health reasons, Gaston had bariatric surgery while she was OIC, resulting in a weight-loss of 100 pounds in a matter of months and as she refers to it a "more feminine

---

[2] On page 11 of the Proposed Third Amended Complaint, the numbering of the paragraphs goes from 40 to 39 and then proceeds consecutively again, therefore the first ¶39 and the first ¶40 are referred to as such.

appearance." (Id. at ¶¶ 35-36). The proposed Complaint alleges that this caused Caugherty to act more aggressively in trying to force her out and helped to fuel his spreading the rumor of an extra-marital affair with inappropriate conduct taking place while on municipal property. (Id. at ¶¶ 35-38, first ¶ 39 and first ¶ 40). This change in appearance also prompted Caugherty to interfere more in the day-to-day management of the Department, to single out Gaston with continual criticism, to issue to her various memos and warnings imposing different standards on her on subjects that generally required uniform treatment, such as absences and use of "comp" time, and that did not have any bearing on her status as OIC. (Id. at second ¶ 39). Following a Council meeting in 2012, Caugherty told Gaston "that as a woman, she could never expect to be chief of the Borough's Police Department." (*Id*. at second ¶ 40). The proposed Complaint asserts that through Caugherty's conduct she was subjected to a hostile work environment based on sex. (*Id*. at ¶ 41).

Gaston met with the Borough Manager and a Borough Council Member on two occasions to complain about Caugherty's actions and rumor spreading, telling them that "Caugherty hates women." (*Id*. at ¶¶ 45-47). Gaston complained in a meeting, asking for assistance from the Borough Manager and a Borough Council Member, and also asked for assistance from the new Solicitor, Robert Bell ("Bell"). (*Id*. at ¶ 49). Some or all of these individuals informed Caugherty that Gaston had complained about his conduct. (*Id*. at ¶ 50). Following her complaints, Caugherty imposed different and stricter conditions on Gaston, including scheduling her to work during times that he knew she was unavailable, requiring her to personally consult with him when she called off work, requiring her to give him doctor excuses, and refusing to approve her use of compensatory time. (*Id*. at ¶ 51). Gaston alleges that male employees were not subject to any of these actions. (*Id*. at ¶ 51). Caugherty also recommended to the Council

that it replace Gaston as OIC with a new Chief of Police. (*Id*. at ¶ 52). Prior to this point, there had been no move by the Borough to hire a chief. (*Id*. at ¶ 55).

Borough officials took no steps to investigate her complaints against Caugherty or to intervene on her behalf other than to report the complaints to Caugherty. (*Id*. at ¶ 56). Instead, the proposed Complaint alleges that "the Borough took actions calculated to terminate Gaston's appointed role as OIC and to ensure that she would not be selected as chief" in order to "punish" her for her complaint about Caugherty's discriminatory conduct. (*Id*. at ¶ 57). The Borough formulated newer, more stringent hiring criteria for the position of Chief of Police, eliminating equivalencies and including the requirement of a college degree. (*Id*. at ¶¶ 58-65). Gaston alleges that there was no "legitimate need" to establish these new criteria. (*Id*. at ¶ 63). Gaston, who does not have a college degree, further alleges that the Borough adopted the new criteria for the purpose of ensuring that she would not be eligible for consideration. (*Id*. at ¶¶ 66, 68). The Borough did not advertise the new criteria. So, Gaston only found out about them after she applied and Solicitor Bell told the Borough Manager that she did not receive an interview because she did not fulfill the requirements for the job, despite the fact that the Borough Manager had assured her that she would be considered. (*Id*. at ¶¶ 66-67). Months before the search for a chief concluded, the Borough was on notice that Gaston was in the process of filing a charge with the EEOC. (*Id*. at ¶ 78).

On March 25, 2013 the Borough announced its hiring of a male Chief of Police. (*Id*. at ¶ 69). A month later the Borough stopped payment of Gaston's annual OIC stipend. (*Id*. at ¶ 70). Until that time she was still performing many of her functions as OIC because the new chief needed to attain a necessary certification that he did not have but needed in order to fulfill his duties as Chief of Police. (*Id*. at ¶¶ 70, 72-73). When he eventually did obtain this certification,

Gaston avers that her duties as OIC "were summarily removed . . . without any type of formal or informal notice or disciplinary hearing." (*Id*. at ¶ 74). The new chief received a salary of $55,000.00 a year while Gaston's combined compensation as OIC had been approximately $40,000.00. (*Id*. at ¶ 82).

## III.   MOTION FOR LEAVE

Gaston explains that she and her attorneys initially filed the Third Amended Complaint without asking for leave to amend based on confusion as to how Rule 15 applies to the present situation, i.e. where the Defendants have answered the First Amended Complaint and subsequently moved to dismiss the Second Amended Complaint. (Docket No. 69 at ¶¶ 3-11). The way they had interpreted it, Rule 15 allows one amendment as of right in response to a 12(b)(6) motion, even where the plaintiff has already amended his or her complaint. (*Id*. at ¶ 10). Gaston now moves this Court to grant her leave to file the Proposed Third Amended Complaint. (Docket No. 69).

According to Gaston, the Proposed Third Amended Complaint seeks to respond to Defendants' Motions to Dismiss by curing the pleading defects in the Second Amended Complaint. (*Id*. at ¶ 14). Gaston points out that while she has amended her Complaint twice already, once in this Court, both amendments were simply to add additional claims and were prior to Defendants filing any motions to dismiss, whereas the filing of the Proposed Third Amended Complaint was the first time she attempted to amend in response to a motion challenging her averments for legal sufficiency. (*Id*. at ¶ 14). She further argues that she was not dilatory in seeking amendment in response to the motions to dismiss, and that Defendants would not be unfairly prejudiced as the Proposed Third Amended Complaint does not add any claims or parties and the Court has already extended the time for discovery. (*Id*. at ¶ 15).

Defendants assert that the proposed Complaint should not be permitted because it would not cure the pleading defects of the Second Amended Complaint and Plaintiff has not demonstrated good cause under FED. R. CIV. P. 16. (Docket No. 73 at 3; 89 at 1-2).

## IV. LEGAL STANDARD

After a responsive pleading has been filed, a party may amend its pleading only "by leave of the court or by written consent of the adverse party." FED. R. CIV. P. 15(a). The Federal Rules of Civil Procedure also provide that courts should freely give leave to amend when "justice so requires." FED. R. CIV. P. 15 (a)(2). Denial of leave to amend is disfavored and a district judge should grant leave absent a substantial reason to deny. *Suley v. Borough*, 2011 WL 860426 at *1 (W.D.Pa. 2011); *see also Shane v. Fauver,* 213 F.3d 113, 115–117 (3d Cir. 2000). Whether to grant a party leave to amend a pleading is within the discretion of the trial judge. *Fraser v. Nationwide Mut. Ins. Co.,* 352 F.3d 107, 116 (3d Cir. 2003). This Court has discretion to deny such a request if it is apparent from the record that: (1) the moving party has demonstrated undue delay, bad faith or dilatory motives; (2) the amendment would be futile; or (3) the amendment would prejudice the other party. *Fraser,* 352 F.3d at 116 (citations omitted).

"Futility" challenges an amendment's legal sufficiency. *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1434 (3d Cir. 1997). In assessing futility, courts apply the same standard of legal sufficiency as applied under Federal Rule of Civil Procedure 12(b)(6). *In re Burlington Coat Factory Sec. Litig.,*114 F.3d 1410, 1434 (3d Cir. 1997); *see also Jablonski v. Pan Am. World Airways, Inc.,* 863 F.2d 289, 292 (3d Cir. 1988) (futility determined by considering whether the amendment would survive a renewed motion to dismiss). Thus, an amendment would be futile if the proposed Complaint fails to state a claim upon which relief could be granted. *Suley,* 2011 WL at *2.

A valid complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)).

The Supreme Court in *Iqbal* clarified that the decision in *Twombly* "expounded the pleading standard for 'all civil actions.'" *Iqbal,* 556 U.S. at 684. The court further explained that although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, the pleadings must include factual allegations to support the legal claims asserted. *Id.* at 678–79. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Twombly,* 550 U.S. at 555). The determination as to whether a complaint contains a plausible claim for relief "is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 678–79 (citing *Twombly,* 550 U.S. at 556).

In light of *Iqbal,* the United States Court of Appeals for the Third Circuit has instructed that district courts should first separate the factual and legal elements of a claim and then, accepting the "well-pleaded facts as true," "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside,* 578 F.3d 203, 211 (3d Cir. 2009). Ultimately, to survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556).

## V.  ANALYSIS

### i.  MOTION FOR LEAVE

In their Supplemental Brief following oral argument, Defendants argue that Gaston's Motion is barred by FED. R. CIV. P. 16.  (Docket No. 89 at 1-2).  Rule 16 provides that a party may only amend its pleading after the deadline for such amendments set in the case management order if the party can demonstrate good cause.  FED. R. CIV. P. 16 (b)(4).  Defendants direct the Court's attention to her own opinion in *Karlo v. Pittsburgh Glass Works, LLC*, 2011 WL 5170445 (W.D.Pa. 2011), which does provide a useful recitation of the relationship between Rule 15(a)(2) and Rule 16:

> The threshold issue in resolving a motion to amend is the determination of whether the motion is governed by Rule 15 or Rule 16 of the Federal Rules of Civil Procedure.  *See Graham v. Progressive Direct Insurance Co.,* 271 F.R.D. 112, 118 (W.D. Pa. 2010).  Under Rule 15(a)(2), leave to amend the pleadings should be "freely granted when justice so requires." Fed.R.Civ.P. 15(a)(2).  Rule 16, on the other hand, requires a party to demonstrate "good cause" prior to the Court amending its scheduling order. Fed. R. Civ. P. 16(b)(4).  Thus, there is "tension" between the two Rules.  *See Race Tires America, Inc. v. Hoosier Racing Tire Corp.,* 614 F.3d 57, 84 (3d. Cir. 2010) . . . .  Where, as here, the motion was filed after the deadline set by the Court, the movant must satisfy the requirements of Rule 16 before the Court will turn to Rule 15.

*Karlo,* 2011 WL 5170445 at *2 (W.D.Pa. 2011).

It is true that the Court's case management order states that after consultation with the parties, motions to amend the pleadings are not anticipated.  (Docket No. 9 at 3).  Hence, under Rule 16, Gaston must show good cause in order to be granted leave to amend.  The Court finds that she has done so here.  In *Karlo*, this Court found that the plaintiffs had not been diligent in seeking the discovery that led to their motion to amend.   *Karlo*, 2011 WL at *3-4; *see also Graham v. Progressive Direct Insurance Co., 271 F.R.D. 112, 119-120 (W.D. Pa. 2010)* (finding no good cause where motion for leave was based on newly discovered evidence which the Court

11

found not to have actually been newly discovered).  Here, Gaston seeks to amend in order to cure possible pleading deficiencies as attacked by motions to dismiss.  (Docket No. 69 ¶ 14).  Since the Proposed Third Amended Complaint and the instant Motion for Leave were filed in direct response to Defendants' Motions to Dismiss, the Court finds that Plaintiff has shown good cause, in that she should be provided the opportunity to respond to Defendants' dispositive motions.

Having determined that Plaintiff has demonstrated good cause, the Court now turns to Rule 15.  Plaintiff's confusion in not initially seeking leave before filing appears to stem from the atypical procedural history of the case and the wording of Rule 15.  (*See* Docket No. 69 at ¶¶ 3-11).  The procedural history of this case is somewhat unusual, in that Plaintiff had already amended her Complaint twice, and Defendants had already filed an Answer, prior to Defendants filing Motions to Dismiss.  Admittedly, Plaintiff's reading is not completely absurd in light of the wording of Rule 15.  *See* FED. R. CIV. P. 15(a)(1)(A)&(B) ("A party may amend its pleading once as a matter of course within . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.").  Gaston's argument is essentially that although she had already amended, her prior amendments were with leave and not as a matter of course, thus when Defendants filed motions to dismiss, Plaintiff was still entitled to amend once as a matter of course.  (*See* Docket No. 69 at ¶¶ 3-11).  However, that is not how this Court reads the rule, nor how other courts have interpreted Rule 15 after the 2009 amendments.  *See Synthes USA Sales, Inc. v. Taylor*, 2012 WL 928190 at *1 (M.D.Tenn. 2012) (discussing that the Advisory Committee Notes accompanying the 2009 amendments have been interpreted to mean that the right to amend as of right applies only to initial pleading) (citing *Kuria v. Palisades Acquisition XVI, LLC*, 752 F.Supp.2d 1293, 1297 (N.D.Ga. 2010)).  Accordingly, Plaintiff was not entitled to amend a third time as of right.

Fortunately, for Plaintiff, as described above, the standard for granting leave to amend under Rule 15 is a liberal one. Courts are directed to allow leave as "justice so requires" and deny the opportunity to amend only in certain particular instances. *See* FED. R. CIV. P. 15 (a)(2); *Fraser*, 352 F.3d at 116. For the same reasons as outlined in response to the Rule 16 challenge, the Court finds Gaston was not dilatory and allowing the amendment will not create any undue delay. Gaston attempted to file her Third Amended Complaint as a timely response to Defendants' Motions to Dismiss, and filed this Motion for Leave the very day after the Court struck the Third Amended Complaint.

Having found that Plaintiff has demonstrated good cause, was not dilatory, and that Defendants will not be unfairly prejudiced, and given the liberal standard for granting leave to amend, the Court will grant Plaintiff leave to amend to state those claims which are not futile. The Court will now address each of Gaston's claims, in turn.

    **ii.**    **FUTILITY**

        **a. COUNT I: HOSTILE WORK ENVIRONMENT**

"Title VII prohibits sexual harassment that is 'sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment.'" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986)). To succeed on her hostile work environment claim, she must establish that 1) she suffered intentional discrimination because of her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected her, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability. *Mandel*, 706 F.3d 157, 167. The first four elements establish a hostile work environment and the fifth determines employer liability. *Id.* (citing *Huston v.*

*Procter & Gamble Paper Prods. Corp.,* 568 F.3d 100, 104 (3d Cir. 2009)).

Gaston has adequately pled the elements of a hostile work environment claim. The Proposed Third Amended Complaint alleges that Caugherty harassed Gaston because she is a woman. (Docket No. 69-2 at ¶¶ 45-49). There are a number of factual allegations to support this averment, including that Caugherty told Gaston that she could never expect to be chief because she was a woman, that he acted repeatedly to undermine her authority as OIC, that he attempted to get her to resign from the Department by falsely claiming that Council was dissatisfied with her performance and about to remove her, that he became more aggressive towards her in reaction to her "more feminine appearance," that he subjected her to constant criticism and differing treatment, and that he spread false rumors that she engaged in sexual misconduct while on municipal property. (*Id*. at ¶¶ 29-38, first ¶ 39, first ¶ 40, second ¶ 39, 51).

Whether or not the conduct complained about was severe or pervasive requires a court to look at the totality of the circumstances. *Mandel*, 706 F.3d at 168. Defendants argue that the Complaint only states legal conclusions and does not allege specific factual allegations. (*See generally* Docket Nos. 60, 73, 80). The Court disagrees. The Court finds at this stage of the litigation that Gaston has alleged enough conduct by Caugherty that, if born out in discovery, reasonably could be found to be severe or pervasive. *See Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 978 (1988) (facially neutral acts also are within Title VII's purview); *Durham Life Insurance Co. v. Evans*, 166 F.3d 139, 148 (3d Cir. 1999)(even facially neutral acts can form the basis of a Title VII hostile work environment claim).

Likewise, the allegations in the proposed Complaint sufficiently plead that the conduct detrimentally affected Gaston and would detrimentally affect a reasonable person in like circumstances. *See Mandel*, 706 F.3d at 161-62, 168-69 (derogatory comments and jokes

sufficient). The final factor, the existence of *respondeat superior* liability, is satisfied by the fact, conceded by Defendants, (*see e.g.*, Docket No. 73 at 5), that Caugherty had supervisory authority over Gaston. *Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104-05 (3d Cir. 2009). Having pled all the elements of a hostile work environment claim under Title VII, the claim is not futile and Gaston will be granted leave to amend Count I.

### b. COUNT II: SEX DISCRIMINATION

Next, Gaston brings a claim alleging that the Borough unlawfully failed to hire her as the chief and ousted her as OIC because of her sex. (Docket No. 69-2 at ¶¶ 88-92). A sex discrimination claim under Title VII requires a plaintiff to first establish a *prima facie* case. *Mandel*, 706 F.3d at 169. To prevail "[a] plaintiff must show that '1) s/he is a member of a protected class, 2) s/he was qualified for the position s/he sought to attain or retain, 3) s/he suffered an adverse employment action, and 4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.'" *Id.* at 169 (quoting *Makky v. Chertoff,* 541 F.3d 205, 214 (3d Cir. 2008)).

Gaston has adequately pled a *prima facie* case of sex discrimination. As a female, she is a member of a protected class. Whether or not Gaston was qualified for the position of chief will likely be a major issue in the case considering the allegations concerning the change in job requirements for the search. However, given the allegations that she essentially was already serving as the acting chief for a couple of years, (Docket No. 69-2 at ¶¶ 14-15, 17, 22), and that she would have been qualified under the 2009 criteria (with the 2012 criteria designed for the purpose of screening her out), (*Id.* at ¶¶ 58-68), she clearly has pled the second element of a *prima facie* case. A failure to promote qualifies as an adverse employment action, and thus, the third element is satisfied. *See e.g., Finn v. Porter's Pharmacy*, 2015 WL 5098657 at n. 2

(W.D.Pa. 2015) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998)). Finally, because the Borough hired a male as the chief, who did not have all of the qualifications required to serve as the Borough of Blairsville Chief of Police at the time he began his position, (Id. at ¶¶ 69-74), and also thereby essentially replaced Gaston, she also has satisfied the fourth element. *See Finn*, 2015 WL 5098657 at *3 ("establishing the fourth prong of the *prima facie* case is an easy burden and may be satisfied by showing that Plaintiff was replaced by someone outside the protected class"). Because Gaston adequately pleads a *prima facie* case, the claim for sex discrimination is not futile and the Court will grant leave to amend with regard to Count II.

### c. COUNT III: RETALIATION

"To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in a protected activity under Title VII; (2) the employer took an adverse action against her; and (3) there was a causal connection between the employee's participation in the protected activity and the adverse employment action." *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006)). Defendants argue that any adverse employment action for retaliation alleged by Gaston would have to have happened after she filed her first and second charges with the EEOC. (*See* Docket No. 60 at 12-15). Plaintiff argues that her verbal complaints to several Borough officials about Caugherty's sexist conduct constituted protected activity. (Docket Nos. 69-2 at ¶ 93, 75 at 3-4). Gaston made complaints prior to the Borough even initiating the search for a new chief. (Docket No. 69-2 at ¶ 57). Her complaints about Caugherty's sexist behavior qualify as protected activity. *Wilkerson*, 522 F.3d at 322 ("Protected activity under Title VII includes opposition to unlawful discrimination under Title VII.") (citing *Moore*, 461 F.3d at 340).

As noted above, Gaston suffered an adverse employment action in the Borough's failure to hire her as chief or promote her to that position. Given the allegations that Gaston's complaints occurred prior to the search for a new chief, that the Borough failed to investigate Caugherty but instead reported the complaints back to him, and that the new employment criteria were put in place in order to disqualify her candidacy, Gaston also has adequately pled a causal connection. Finding that the proposed Complaint pleads a *prima facie* case for retaliation under Title VII, that claim is not futile and Gaston will be granted leave to amend with regard to Count III.

### d.  COUNT IV: EQUAL PROTECTION

Count IV of the proposed Complaint brings a claim under § 1983 against Defendant Caugherty for violation of Gaston's equal protection rights. (Docket No. 69-2 at ¶¶ 98-102). While this claim is brought pursuant to a different statute and against Caugherty rather than the Borough, it is couched on the same factual allegations as the claim for hostile work environment. (*Id.*).

In order to prevail on a § 1983 claim for a violation of the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must prove that she was subject to "purposeful discrimination" because of her sex. *Keenan v. City of Phila.,* 983 F.2d 459, 465 (3d Cir. 1992); *Kahan v. Slippery Rock Univ. of Pennsylvania*, 50 F.Supp.3d 667, 705 (W.D. Pa. 2014). Specifically, to state her claim of discrimination as a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against her because of her membership in the protected class. *Chambers v. Sch. Dist. of Phila. Bd. of Educ.,* 587 F.3d 176, 196 (3d Cir. 2009). Employment discrimination is actionable as an equal protection violation and the showing required to prove unlawful discrimination as a § 1983 claim follows

the same framework as with Title VII. *Stewart v. Rutgers,* 120 F.3d 426, 432 (3d Cir. 1997); *Kahan*, 50 F.Supp.3d at 705. Like other forms of employment discrimination, hostile work environment claims are actionable under § 1983. *See generally Bonenberger v. Plymouth Tp.*, 132 F.3d 20, 22-25 (3d Cir. 1997).

As discussed in detail above, Gaston has adequately pled a hostile work environment claim and claim for discrimination based on sex under Title VII, and nowhere do Defendants dispute that Caugherty is a state actor. (*See generally* Docket Nos. 60, 73, 80). Nevertheless, Defendants argue that Gaston fails to allege any similarly situated individuals who received different treatment. (Docket No. 60 at 16). As an initial matter, Defendants appear to be incorrect that Gaston brings her equal protection claim as "a class of one." Rather, she brings the claim as a member of a protected class--females. Secondly, most, if not all, of the conduct Gaston complains about with respect to the hostile work environment claim is not specific to her holding the position of OIC. She alleges that Caugherty singled her out for constant criticism and issued various memos and warnings to her imposing different standards with respect to her as opposed to other officers on subjects that generally required uniform treatment, such as absences, use of "comp" time, and that did not have any bearing on her status as OIC. (*See* Docket No. 69-2 at ¶ 39). For these reasons and the discussion *supra*, the equal protection claim is not futile and Plaintiff will be granted leave to amend Count IV.

### e. COUNT V: EQUAL PAY ACT

In Count V, Gaston claims that the Borough violated the Equal Pay Act because it paid her a lower salary as OIC than it paid the new chief to perform the same job functions and tasks. (Docket No. 69-2 at ¶ 104). The Equal Pay Act provides that an employer may not "discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than

18

the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). In assessing an Equal Pay Act case, the courts utilize the familiar shifting burden framework. *EEOC v. Del. Dep't of Health & Soc. Servs.,* 865 F.2d 1408, 1413 (3d Cir. 1989). To establish a *prima facie* case under the Equal Pay Act, a plaintiff must show that a defendant paid different wages to employees of the opposite sex for equal work on jobs that required equal skill, effort, and responsibility performed under similar working conditions. *Wildi v. Alle-Kiski Med. Ctr.*, 659 F.Supp.2d 640, 657-59 (W.D.Pa. 2009) (citing *Dubowsky v. Stern,* 922 F.Supp. 985, 990 (D.N.J. 1996)). In short, Gaston must show that she was paid differently for "substantially equal" work. *Del. Dep't of Health,* 865 F.2d at 1413.

If a plaintiff is able to make out a *prima facie* case, the burden shifts to the defendant to raise one of the four affirmative defenses stated in the Equal Pay Act. "The four affirmative defenses include three that are 'specific and one general catchall.'" *Wildi*, 659 F.Supp.2d at 657-59 (citing *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97 (1974)). An employer's burden to prove an affirmative defense is a high one. *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000) (noting that an employer cannot prevail at the summary judgment stage based upon an affirmative defense unless it can prove the existence of the affirmative defense "so clearly that no rational jury could find to the contrary") (citing *Del. Dep't of Health,* 865 F.2d at 1414). Under the Equal Pay Act, plaintiff does not need to prove that an employer intended to discriminate. A showing of intent, however, may be used to establish that an employer's affirmative defense is a pretext for discrimination. *Wildi*, 659 F.Supp.2d, at 658 (citing *Del. Dep't of Health,* 865 F.2d at 1414).

Contrary to Defendants' assertions, Gaston has pled a *prima facie* case under the Equal Pay Act. She alleges that as OIC she "performed all of the material duties" of the Chief of Police and that the male chief's salary was approximately $55,000.00 while her combined salary as a patrol officer and OIC was roughly $40,000.00. (Docket No. 69-2 at ¶¶ 81-82). This is all she really needs in order to state a claim under the Equal Pay Act. Admittedly, Gaston did not perform *all* of the duties of chief, (*see* Docket No. 69-2 at ¶ 23), but she avers that she performed a substantial portion of those duties. *See Wildi*, 659 F.Supp.2d, at 658 ("It is well settled that the jobs do not need to be identical in every respect."). Whether or not the jobs were sufficiently similar is better left to a later stage in the proceedings, after the parties have completed discovery into what exactly Gaston did and did not do as OIC and what the new chief does or does not do.

Likewise, Defendants *may* have a number of compelling affirmative defenses. Given the stringent burden on defendants in proving affirmative defenses under the Equal Pay Act, resolution of same is better left until a later stage of this case. For example, Defendants ultimately may assert that the individual hired as chief had additional qualifications that justified higher compensation. Nevertheless, discovery should be permitted regarding just exactly what those qualifications are, and how they bear on the duties as chief. Similarly, other federal courts have held that the fact that a job is temporary can be a factor other than sex justifying unequal pay. *See Joyner v. Town of Elberta*, 22 F.Supp.3d 1201, 1209 (S.D.Ala. 2014) (stating that the "temporary nature of a position is another 'factor other than sex' to justify an otherwise illegal pay disparity, provided that the position was temporary in fact and that the employee in that position knew it was temporary")(quoting *Nelson v. Chattahoochee Valley Hosp. Soc.*, 731 F. Supp.2d 1217, 1235-37 (M.D.Ala. 2010)); *see also* 29 C.F.R. § 1620.26(b). As discussed at length with regard to Gaston's procedural due process claim in the next section, it is clear on the

face of the proposed Complaint that the position of OIC was intended eventually to give way to a Chief of Police as opposed to a *de facto* one in the position of OIC, whether the new chief be Gaston, or someone else. Yet, the defense that the position was temporary in nature is tempered by practical considerations and guidance. When the temporary position lasts longer than one month, well over that here, it "[g]enerally . . . will raise questions as to whether the reassignment was in fact intended to be temporary." 29 C.F.R. § 1620.26(b); *see also Nelson*, 731 F. Supp.2d at 1235-37; *Fuller v. Glob. Custom Decorating*, 2007 WL 44507, at *9-10 (W.D.Pa. 2007). For now, the Court finds that Gaston has adequately pled a *prima facie* violation of the Equal Pay Act and will grant leave to amend Count V.

### f. COUNT VI: PROCEDURAL DUE PROCESS

To properly state a claim for a violation of the Fourteenth Amendment's Procedural Due Process Clause under § 1983, a plaintiff must plead: "(1) that [she] was deprived of a protected liberty or property interest; (2) that this deprivation was without due process; (3) that the defendant subjected [her], or caused [her] to be subjected to, this deprivation without due process; (4) that the defendant was acting under color of state law; and (5) that [she] suffered injury as a result of the deprivation without due process." *Sample v. Diecks,* 885 F.2d 1099, 1113 (3d Cir. 1989).

With respect to the first element, "property interests are 'created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Bartal v. Borough of Laureldale,* 515 F.Supp.2d 556, 561 (E.D.Pa. 2007) (quoting *Board of Regents of State Coll. v. Roth,* 408 U.S. 564, 577 (1972)). State law determines whether or not an individual has a property interest in her government employment.

*Elmore v. Cleary,* 399 F.3d 279, 282 (3d Cir. 2005). "A Pennsylvania public employee has at-will status and does not have a property interest in his employment, unless there is express legislative language to the contrary." *Bartal,* 515 F.Supp.2d at 561 (citing *Elmore,* 399 F.3d at 283). An at-will employee "does not have a legitimate entitlement to continued employment because [the employee] serves solely at the pleasure of [the] employer." *Elmore,* 399 F.3d at 282.

Gaston points to 8 Pa. C.S.A. § 1190 as the state law creating a property interest. (Docket No. 69-2 at ¶ 110). Defendants argue that § 1190 was only in effect after Gaston was removed as OIC. (Docket No. 60 at 20). Regardless, the same language was previously in effect at 53 P.S. § 46190. *See Conner v. Borough of Eddystone, Penn.*, 2015 WL 1021363 at n. 5 (E.D.Pa. 2015). Section 1190(a) states that "[n]o person employed in any police or fire force of any borough may be suspended without pay, removed, or reduced in rank except for [six enumerated reasons]." Courts have interpreted this statute as conferring a property interest. *Dee v. Borough of Dunmore*, 549 F.3d 225, 230 (3d Cir. 2008). While she remains employed by the Department as a patrolman, Gaston avers that her removal as OIC constituted a change in rank and was "disciplinary in nature," thus requiring the Borough to have conducted a *Loudermill* hearing. (Docket No. 69-2 at ¶¶ 110-11). Defendants dispute the assertion that the OIC position actually constituted a change in rank. (Docket No. 86 at 28:1-12). They also argue that the Borough's removal of Gaston from OIC was not disciplinary in nature and more akin to a cost-cutting measure. (Docket No. 60 at 21-22).

Even giving Gaston the benefit of the doubt on the rank question, the problem with her procedural due process claim is the nature of the OIC position itself. Unlike her Title VII claims, the procedural due process claim stems not from the Borough's failure to hire her as chief, but

exclusively from the Borough's failure to retain her as OIC. (Docket No. 69-2 at ¶ 108). The Court agrees with Defendants that Gaston has failed to plead that she had a property interest in continued employment as OIC.

The Borough appointed Gaston as OIC following significant turmoil in the Department, including the firing of one chief and the resignation of another in less than a year. (*Id*. at ¶¶ 12-14). Gaston admits the position was temporary and that the Borough would eventually hire a Chief of Police. (*Id*. at ¶ 15) ("Based on these comments, Gaston reasonably understood that her appointment as OIC gave her the opportunity to demonstrate her competency for permanent appointment to the position of chief."). The Borough felt the need to reappoint Gaston to OIC for 2012. (*Id*. at ¶ 27). The Complaint goes to great lengths to make clear that the duties Gaston performed while OIC were the same duties generally performed by the chief. Gaston's view is that "OIC was in effect acting chief." (*Id*. at ¶ 22). According to Solicitor Dougherty, the authority and duties normally held by the chief were effectively split between Gaston as OIC and Caugherty. (*Id*. at ¶ 23) ("Solicitor Dougherty opined . . . she was in charge of the day-to-day operations of the Department and that Mayor Caugherty's role was limited to oversight with respect to budgetary matters . . ."). The Complaint later avers that "Gaston performed all the essential functions of the chief of police" as OIC. (*Id*. at ¶ 72).

In short, as alleged, everyone including Gaston contemplated the position of OIC as both temporary and in lieu of the Borough having a Chief of Police, and that the position was always intended to eventually give way to an actual Chief of Police. Nevertheless, Gaston asserts a procedural due process claim that seems to be based on one or both of the following premises: (1) that she was entitled to remain OIC notwithstanding the appointment of a new chief, or (2) that once she was appointed as OIC, the Borough could only hire a new chief (other than Gaston,

presumably) if it had cause to remove Gaston as OIC. The Court finds neither of these theories to be persuasive.

The proposed Complaint seems to suggest that even once the new chief took over, the Borough was still required to provide Gaston with a hearing before removing her as OIC. (*See e.g.,* Docket No. 69-2 at ¶¶ 74-75, 77, 108-11). For example, Plaintiff states that once the new chief took over, her OIC duties were "summarily removed" without notice or disciplinary hearing. (*Id*. at ¶ 74). Since the Borough provided Gaston's OIC stipend as compensation for doing the duties of the Chief of Police, once a new chief took over those duties, there would have been no reason for the Borough to continue to pay Gaston to serve as OIC. Furthermore, nowhere in the proposed Complaint does Plaintiff allege any factual basis to support that she had, let alone had reason to have, an expectation that she would continue to be OIC even after the Borough hired a new chief. (*See generally* Docket No. 69-2). Instead, it appears clear from the outset that the existence of the position of OIC was conditioned on the Borough not having an actual Chief of Police. Thus, Gaston could not possibly have had a claim of entitlement to continue to serve as OIC and taking away her position and stipend did not constitute a violation of her procedural due process rights. *See Kavakich v. Bentleyville Borough*, 2008 WL 2563377 at *3 (W.D.Pa. 2008) (discussing that Pennsylvania law recognizes a reorganization exception for such cost-cutting measures and concluding: "When a termination is directed at positions rather than individuals, the hearing mandated by the Fourteenth Amendment's due process protection need not be held.").

Gaston's slightly more plausible argument is that the Borough's decision to initiate a search for a new chief, allegedly based on Caugherty's sexism, itself constituted discipline which had the intended effect of resulting in a change of rank. (*See* Docket No. 69-2 at ¶¶ 76-80). The

Court holds, however, that Gaston never had a property interest in OIC because, as discussed above, it was clear from the beginning that the position was not permanent and the Borough would eventually hire a chief. Accordingly, Gaston cannot have had an expectation of indefinite employment as OIC. She may have expected that her appointment would give her an "opportunity to demonstrate her competency for permanent appointment," (*id*. at ¶ 15), but that is a far cry from saying the Borough could only hire a new chief if it selected Gaston or if it first had cause to remove her as OIC. Nowhere in the proposed Complaint does Gaston even attempt to plead that the Borough in creating the OIC position contemplated any limitations on its ability to hire a new chief. (*See generally* Docket No. 69-2).

Section 1190, 8 Pa. C.S.A., does not specifically speak to a temporary, acting, or interim position such as the one Gaston clearly held here, nor does there appear to be any case law applying § 1190 to such a scenario. Allowing Plaintiff's due process claim would require reading § 1190 as completely prohibiting a Borough from temporarily "appointing" an officer to fill a vacancy on an acting or interim basis without constitutionally guaranteeing that officer the right to continue in that position indefinitely absent cause. This would be an odd result and nothing in § 1190 suggests such broad applicability. *See Bartal,* 515 F.Supp.2d at 561 (a Pennsylvania public employee is at-will and without a property interest "unless there is express legislative language to the contrary") (citing *Elmore,* 399 F.3d at 283). While not dealing with § 1190 or Pennsylvania law, other federal courts have reached the same conclusion under similar situations. See *Murray v. Bd. of Educ. of City of New York*, 984 F.Supp. 169, 183 (S.D.N.Y. 1997) (finding plaintiff had no property interest in an Acting Supervisor job because the position was interim); *Woods v. Milner*, 760 F.Supp. 623, 643-44 (E.D.Mich. 1991) *aff'd*. 955 F.2d 436 (6th Cir. 1992) (finding a temporary employee did not have a property interest under a federal

statute); see also *Hatley v. City of Charlotte*, 826 F.Supp.2d 890, 899 n.1 (W.D.N.C. 2011) (in the absence of state case law on property interests arising from temporary assignments, court looked at case law concerning federal property interests in a temporary federal employment assignment finding plaintiff failed to show legitimate claim of entitlement in a temporary promotion)(citing *Pinar v. Dole*, 747 F.2d 899, 915 (4th Cir. 1984)).

Plaintiff may have a cognizable injury here, but if she does, it would stem from Title VII and the Borough's failure to hire her as the Chief of Police. *See Clark v. Township of Falls*, 890 F.2d 611, 618-19 (3d Cir. 1989) (finding no property interest in employment for a procedural due process claim, but noting "that a wide panoply of adverse employment actions may be the basis of employment discrimination suits under Title VII"). For the foregoing reasons, the Court finds that Gaston's procedural due process claim is futile and will deny leave to amend with regard to Count VI.

### g. COUNT VII: SLANDER *PER SE*

Gaston alleges in her final claim that Caugherty's comments regarding her having an extramarital affair constitute slander *per se* under Pennsylvania law. (Docket No. 69-2 at ¶¶ 115-25). Defendants argue that Caugherty as a high public official is absolutely immune. (Docket No. 52 at 4). Based on the factual allegations in the proposed Complaint, the Court finds that it is premature to conclude that Caugherty is shielded from the claim. Pennsylvania "exempts a high public official from all civil suits for damages arising out of false defamatory statements and even from statements or actions motivated by malice, provided the statements are made . . . in the course of the official's duties or powers and within the scope of his authority, or as sometimes expressed, within his jurisdiction." *McKibben v. Schmotzer*, 700 A.2d 484, 489 (Pa. Super. Ct. 1997) (quoting *Matson v. Margiotti*, 88 A.2d 892, 895 (1952)). To qualify for the

privilege, a defendant must (1) be a "high public official" and (2) have made the comments within the scope of his or her authority. *See McKibben*, 700 A.2d at 488-90. It makes no difference that the statements in question may have been false or defamatory or even motivated by malice. *Hall v. Kiger*, 795 A.2d 497, 499 (Comm. Ct. Pa. 2002) (citing *Matson v. Margiotti*, 88 A.2d at 895). In determining whether an official was acting within the scope of his or her authority, two factors are particularly instructive: "(1) the formality of the forum in which the words were spoken or published, and (2) the relationship of the legitimate subject of governmental concern to the person seeking damages . . ." *Hall*, 795 A.2d at 501.

As Mayor of the Borough of Blairsville, Caugherty was a "high public official" for the purposes of the doctrine. *Lindner v. Mollan*, 677 A.2d 1194 1198-99 (1996); *McKibben*, 700 A.2d at 489-90. It is the second element that is disputed, namely whether Caugherty made the comments within the scope of his authority. Gaston alleges two instances where Caugherty spread the rumor of her extramarital affair, both of which she adequately describes as private, casual, and lacking in any hint of official business. (Docket No. 69-2 at ¶¶ 129, 131). First, Caugherty went to the office of Municipal Authority Executive Director Ronald Hood. (*Id*. at ¶ 29). According to the Complaint, Hood did not have any supervisory authority over Gaston, Caugherty did not indicate he was going to take any action with regard to the matter, and Caugherty did not ask Hood to take any action. (*Id*. at ¶ 30). The Court would note, however, that the individual with whom Gaston was supposedly having the affair did work for the Municipal Authority, (*id*. at ¶ 29), and thus, presumably was under Hood's supervision. The Complaint characterizes this meeting as "a casual drop in" during which Caugherty made no attempt to discuss borough business. (*Id*. at ¶ 30). The second instance occurred at the private residence of Terry DeBiase, a member of the Municipal Authority Board and a neighbor of

Gaston. (*Id*. at ¶ 31). The substance and nature of this meeting were similar to the meeting with Hood. (*See id*. at ¶¶ 31-32).

In response, Defendants argue that Caugherty has broad authority to direct the Police Department under Pennsylvania law. (Docket No. 52 at 6-10). Defendants go on to imply that Caugherty acted out of concern that Gaston having an extramarital affair affected her fitness and "availability" as the public "face" of the Department. (*See id*. at 9). Given Gaston's allegations in the proposed Complaint that the comments were made to individuals with no authority over Gaston, that the conversations were casual and of a private nature, and that the conversations lacked any specific discussion of Borough business, the Court cannot, without further development of the record say that Caugherty acted within the scope of his official authority. *See Hall*, 795 A.2d at 501 (noting a particularly important factor is the formality of the forum, and finding a councilman acted within his authority when making comments in a public meeting while performing as councilman but that if he had sought to make them outside of formal public discussion, he could not claim the defense); *see also Rok v. Flaherty*, 527 A.2d 211, 213-14 (Pa. Comm. Ct. 1987) (reversing lower court order which sustained preliminary objections on the "high public official" immunity grounds, finding questions remained as to whether statements were made within the scope of employment and whether actions exceeded that scope).

Having found that the count is not futile, the Court will grant Plaintiff's Motion for Leave with regard to the slander *per se* count. The Defendants are, however, permitted to assert high public official immunity for determination later.

## VI. CONCLUSION

For the foregoing reasons, the Court finds that Gaston has demonstrated good cause under FED. R. CIV. P. 16 and satisfied the requirements of FED. R. CIV. P. 15 with respect to the

Proposed Third Amended Complaint, as to all but the procedural due process claim, which the Court finds to be futile. Accordingly, Plaintiff's Motion for Leave to File Third Amended Complaint *nunc pro tunc*, (Docket No. [69]), is GRANTED, in part and DENIED, in part.

An appropriate order follows.

<u>*s/Nora Barry Fischer*</u>
Nora Barry Fischer
United States District Judge

Date: December 14, 2015

cc/ecf: All counsel of record